UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

MARILYN BODINE,                    )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )        Case No. 2:14 CV 60 CDP
                                   )
CAROLYN COLVIN,                    )
                                   )
            Defendant.             )

## MEMORANDUM AND ORDER

Marilyn Bodine has Parkinson's disease.  She applied for benefits from the

Social Security Administration.  Although the Administrative Law Judge assigned

to her case agreed that Bodine was disabled, he concluded that her onset date for

benefits purposes was after her date last insured.  Because this decision was not

supported by substantial evidence, I will reverse the decision of the Commissioner

and remand this case for further proceedings.

## Procedural History

This is an action for judicial review of the Commissioner's decision denying

Bodine's application for disability insurance benefits under Title II of the Act, 42

U.S.C. §§ 401 et seq., and application for supplemental security income (SSI)

benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq.  Section 205(g) of

the Act, 42 U.S.C. §§ 405(g), provides for judicial review of a final decision of the

1

Commissioner.  Bodine filed her applications for benefits on February 10 and 17, 2009.  She claims that she has been disabled from Parkinson's disease beginning October 1, 2006.  Bodine's insured status under Title II of the Act expired on June 30, 2007.  On July 2, 2012, following a hearing, the ALJ issued a decision partially favorable to Bodine.  Although the ALJ concluded that Bodine was disabled beginning in February of 2011, he found that she was not disabled from October of 2006 through February of 2011.  Because Bodine was determined not to be disabled before her date last insured, she was denied disability insurance benefits. The Appeals Council of the Social Security Administration (SSA) denied her request for review on May 5, 2014.   Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the Administrative Law Judge

### Application for Benefits

Bodine completed an Adult Disability Report in conjunction with her application for benefits.  In it, she states that she can do "less and less."  Bodine reports having difficulty taking care of herself.  She states that her hands hurt, and she shakes all the time and moves very slowly.  Bodine also claims that her medications cause fatigue, so she must rest frequently.  (Tr. 222).

<u>Medical Records</u>[1]

Bodine started having tremors in 2004 at age 56. On June 1, 2005, Bodine went to the emergency room at the Boone Hospital Center in Columbia, Missouri because her family said she had been "acting funny all day." She had slurred speech and an unsteady gait. Bodine reported that she had Parkinson's disease and was taking Sinemet and Primidone. David L. McLaren, M.D., examined Bodine and diagnosed a right-sided Bell's palsy. (Tr. 320). He told her it would resolve, and Bodine was discharged the same day. (Tr. 316-18). Bodine's Bell's palsy lasted one week. (Tr. 335).

On June 17, 2005, Bodine was evaluated by neurologist Irving Asher, M.D., for Parkinson's disease. Bodine reported a shaking of her left hand that began one year prior and was present at rest and with use. She stated that it interfered with her piano playing and with holding a paper. Dr. Asher reviewed Bodine's treatment to date. According to Bodine, she was treated with Mysoline, which helped her tremor, but made her "loopy." She was given Requip, which caused

---

[1] Here, Bodine must prove that she was disabled before her last insured date of June 30, 2007. "When an individual is no longer insured for Title II disability purposes, we will only consider her medical condition as of the date she was last insured." <u>Davidson v. Astrue</u>, 501 F.3d 987, 989 (8th Cir. 2007) (internal quotation marks and citation omitted) (alteration omitted). The Eighth Circuit Court of Appeals has recognized that it "has reached different conclusions about whether medical evidence concerning a claimant's condition at a later time is probative of her condition during the period of insured status." <u>Id.</u> at 990 (comparing <u>Rehder v. Apfel</u>, 205 F.3d 1056, 1061 (8th Cir. 2000) with <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1169 (8th Cir. 1984)). As this evidence was considered by the ALJ and is part of the administrative record, I will summarize it here.

vomiting and headaches. Topomax caused her to lose a significant amount of weight, and Artane gave her dry mouth and "turned her teeth to chalk." Dr. Asher noted that a report of an MRI performed on December 22, 2004, showed mild periventricular white matter changes and probable inferior right prominent Virchow-Robin space versus less likely chronic lacunar infarct. Bodine listed her current medications as Primidone, Sinemet, Plavix, Atenolol, fish oil, Niacin, and vitamins. Physical examination revealed mild rigidity, with no drift and normal strength, symmetric reflexes, and downgoing toes. Sensory examination was intact to primary and cortical modalities. Dr. Asher observed a mild-to-moderate left arm resting tremor, increased with contralateral activity, and a gait with diminished arm swing on the left side. Her handwriting revealed no evidence of micrographia and a smooth Archimedes spiral. Dr. Asher's impression was that Bodine's exam was consistent with a diagnosis of Parkinson's disease. Dr. Asher decided to try a titration of Mirapex slowly, a continuation of Sinemet 25/100 mg three times daily at 8 a.m., 12 p.m., and 5 p.m., and a changing of her current dosage of 250 mg of Primidone twice daily to 250 mg in the morning followed by 125 mg in the afternoon and evening, with a possibility of tapering down the dosage. (Tr. 335-36).

Bodine saw Dr. Asher again on August 17, 2005. He reported that Bodine "experienced significant difficulty with tremor and it was unclear what part of this

was essential tremor, though it seemed clear that she did indeed have Parkinson's disease." Bodine reported "a very significant improvement in her tremor" with the addition of Mirapex, so she elected on her own to taper herself off of the Primidone. Bodine stopped taking Primidone and stated that "her tremor has essentially disappeared." She reported being "thrilled with her response to the Mirapex." Bodine reported no significant side effects from Atenolol and Plavix. Physical examination revealed no rigidity, bradykinesia, or tremor. Her cranial nerves, strength, reflexes, and ambulation were normal. Dr. Asher found Bodine to be "cognitively quite intact." Dr. Asher continued Bodine's medications unchanged (Mirapex 1 mg three times daily, Atenolol 100 mg daily, Plavix 75 mg daily, and Sinemet 25/100 mg three times daily) and scheduled a follow-up visit in six months. (Tr. 334).

Bodine's next follow-up visit with Dr. Asher was on March 23, 2006. Dr. Asher noted that Bodine "continues to do well." He reported that she was awake, alert, and cognitively intact. Her cranial nerves, strength, and tone were normal, and she had symmetric reflexes. No tremor was evident, posturally or with intention. Dr. Asher continued her medication unchanged. (Tr. 333).

Bodine was evaluated by Dr. Asher on April 3, 2007. Dr. Asher noted that "[s]he does not complain of any particular difficulty with her Parkinson's. She has been under some significant stress related to minor turmoils related to the

neighbors and various other issues, but no major illnesses on her part or immediate family." Bodine also told Dr. Asher that she was not noticing any significant wearing off of her medication and that she was sleeping okay. Upon examination, Bodine was noted to be awake, alert, and cognitively intact. Her cranial nerve exam was normal and she had normal tone and strength. Her reflexes were symmetric, and there was no tremor or bradykinesia. Bodine's gait was fluid. Dr. Asher continued her medications unchanged (including 25/100 mg Sinemet at 8 a.m., 12 p.m., and 5 p.m. and Mirapex 1 mg at 6 a.m., 2 p.m., and 10 p.m.) and told Bodine to return in six months for a follow-up visit. (Tr. 332).

Bodine returned for her follow-up visit on April 24, 2008. She reported doing well, with a little bit of tremor in the morning. Physical examination revealed mild rigidity in the left arm, but no bradykinesia or observable tremor at that time. Otherwise, Bodine was awake, alert, and cognitively bright, with intact postural reflexes and normal strength and gait. Dr. Asher decided to continue her medications unchanged, and recommended a follow-up visit in four months. (Tr. 331).

Bodine saw Dr. Asher again on February 27, 2009. At that time, Bodine reported mild wearing off of her medication. Physical examination revealed mild rigidity in her right upper extremity, but no significant bradykinesia or tremor. She was able to ambulate easily, had normal cranial nerves, and was cognitively intact.

Dr. Asher changed the dosage of her Sinemet to four times daily and continued her current dosage of Mirapex. He recommended a follow-up appointment in three to four months. (Tr. 343).

Bodine returned for a follow-up visit with Dr. Asher on January 4, 2010. At that time, she reported that changing her dosage of Sinemet had been "of great benefit." Dr. Asher noticed that Bodine was showing some mild rigidity and bradykinesia of her upper extremities and mild bradykinesia in her left lower extremity and noted that she "continues to have wearing off and her symptomology seems to have increased perhaps just a bit." Dr. Asher observed no tremor or dyskinesia, and her cranial nerves were normal. Bodine reported that it took about an hour for her first dose of medication to "kick in" and it wore off about 15-30 minutes before her next dose, which then took about 30 minutes to work. Otherwise, Bodine reported no cognitive or sleeping difficulties. Dr. Asher recommended treatment with COMT inhibition and switching her from Sinemet to Stalevo 100 mg four times daily, with continuation on the Mirapex. (Tr. 383).

Bodine went back to Dr. Asher on June 15, 2010. Bodine complained of dysuria while on Stalevo, so he switched her back to Sinemet. Dr. Asher noted that "generally she does okay, perhaps some wearing of[f], but does not sound like she is necessarily regular in taking her medicine. I have given her a schedule today and I have asked her to take the Sinemet 25/100 at 6, 10, 2, and 6, and her Mirapex

1 mg at 6, 2, and 10." Bodine denied any excessive sleepiness, impulse control difficulties, confusion, or hallucinations. Physical examination showed Bodine to be awake and cognitively bright. Her cranial nerves were normal, but she had mild rigidity and bradykinesia of her left arm. No tremor was observed, and she had normal strength and ambulation. Dr. Asher recommended continuation of her medications on the recommended schedule and a follow-up visit in four months. (Tr. 382).

Dr. Asher next saw Bodine on February 22, 2011, which is the date the ALJ decided was her onset date. Bodine told Dr. Asher that she was "doing quite poorly" because her husband underwent gallbladder surgery and was experiencing postoperative difficulties. As a result, Bodine was stressed out and unable to sleep. Her tremor was "much worse" and she reported wearing off of her medications. Dr. Asher described Bodine as awake and alert, neatly attired, but mildly anxious. She was cognitively intact with normal attention, orientation, language, knowledge, and memory. Her cranial nerves were normal. Bodine had mild rigidity and mild-to-moderate bradykinesia in her left upper extremity, mild bradykinesia in her left lower extremity, and some moderate generalized tremor. Her strength and gait were normal, and her postural reflexes were intact. Dr. Asher's impression was that Bodine's Parkinson's symptoms were worse compared to her previous exam. He stated that her "tremor is certainly worse and

that may be related to her anxiety." He decided to continue her medications as previously prescribed, but he noted that "she will need adjustment of her medicine soon and probably reinstitution of COMT inhibition or consideration of addition of MAO inhibition . . . ." (Tr. 386-87).

At the request of counsel, Dr. Asher completed a medical source statement in connection with Bodine's applications for benefits on May 31, 2012. Although the first page of the questionnaire is difficult to read, it appears that Dr. Asher indicated that Bodine's Parkinson's disease produced limitations in her ability to lift, carry, stand, walk, sit, push, and pull. He recommended that she never climb, kneel, crouch, or stoop. Dr. Asher also opined that Bodine's ability to reach, handle, finger, and feel objects was limited due to her rigidity and bradykinesia. The questionnaire then states that "the claimant indicates his/her disability began: 10/1/06." It then asks, "Do you agree with this date"? Next to the question there is a box to check "Yes" or a box to check "No." Dr. Asher did not check either box. Then questionnaire then goes on to state, "If 'No,' please state when you believe the claimant's limitations you found began." Next to this statement there is a blank line to fill in a date. Dr. Asher did not write in a date. Finally, the questionnaire asks whether Bodine's limitations "lasted or will they last for 12 consecutive months"? In response, Dr. Asher checked the "Yes" box.

<u>Testimony</u>

At the time of the hearing on June 5, 2012, Bodine was 64 years old and weighed 150 pounds. She is 5'4 ½" tall and has a high school diploma. She lives on a farm with her husband and drives about once a week to church. Bodine was an office manager and "gofer" from 1997 through 2001. She kept the books, made out the payroll, and scheduled people on job sites. As part of that job, Bodine also "set up the jobs where they went to, putting in the geothermal in the ground for a heat pump." (Tr. 39). Bodine also hauled parts around that weighed between 20 and 30 pounds. After 2002, Bodine worked on the family farm. She stopped working in October of 2006 because her hand started shaking. Bodine stated that she could no longer open the cattle gates, climb up on the tractor, and lift things. Bodine testified that she could not have done her old secretarial job, either, back in 2006 because she couldn't lift and carry the 20-30 pound parts. She also said she couldn't have walked half the day to deliver parts to job sites. Bodine stated she did some keyboarding in her old job, and it would have taken her longer than it used to because her hand shakes. (Tr. 37-48).

Bodine sees her neurologist, Dr. Asher, about once every four months. He monitors her medication and told her to be careful of falling. Her medications are effective for a little while, but then they wear off. Her medication also makes her tired. She thinks she can lift about five pounds and stand 10-15 minutes before

needing to sit down.  Her walking is getting worse.  Bodine's shaking hands affect her writing, and she has problems with dropping and holding things.  She has a muscle on her left side that draws and "gets real tight."  (Tr. 49).  She has only played the piano "a little bit" since October of 2006 because she can't move her hands.

Bodine does very little cooking, and her husband helps her with the laundry. She spends most of her day watching television and taking care of her dogs.  She doesn't walk them though.  She attends church weekly, although she has trouble sitting through the whole service and at times has to stand up.

A vocational expert (VE) also testified at the hearing.  He classified Bodine's past relevant work as secretary, which he stated was skilled sedentary work performed at a light level.  The ALJ presented two hypotheticals to the VE. In the first, the VE stated that an individual of Bodine's age, education, and past work history with frequent use of her right and left hands for handling and fingering could return to Bodine's past relevant work as a secretary.  In the second, however, the VE stated that the individual could not perform past relevant work if limited to occasional use of the hands for handling and fingering.  (Tr. 52).

## **Legal Standard**

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  <u>Gowell v.</u>

Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a

preponderance, but is enough so that a reasonable mind would find it adequate to

support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir.

2000). As long as there is substantial evidence on the record as a whole to support

the Commissioner's decision, a court may not reverse it because substantial

evidence exists in the record that would have supported a contrary outcome, id., or

because the court would have decided the case differently. Browning v. Sullivan,

958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is

substantial, a court considers "evidence that detracts from the Commissioner's

decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451

(8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

Where the Commissioner's findings represent one of two inconsistent conclusions

that may reasonably be drawn from the evidence, however, those findings are

supported by substantial evidence. Pearsall v. Massanari, 274 F.3d 1211, 1217

(8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates

whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters

as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

Id. at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding. Casey v. Astrue 503 F.3d 687, 696 (8th Cir. 2007). However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).

## The ALJ's Findings

On July 2, 2012, the ALJ issued his partially favorable decision that Bodine was disabled beginning February 22, 2011, which is after her date last insured of June 30, 2007. He found that Bodine had the severe impairment of Parkinson's disease and that, prior to February 22, 2011, she retained the residual functional capacity to perform work at all exertional levels, except that she was limited to frequent handling and fingering with both hands. The ALJ concluded that Bodine retained the residual functional capacity to perform the full range of sedentary work, except that she would be limited to occasional use of both hands for handling and fingering, beginning February 22, 2011. In fashioning Bodine's RFCs, the ALJ determined that her impairment could be expected to produce some of her alleged symptoms; however, he concluded that Bodine's statements

15

concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible before February 22, 2011, to the extent they were inconsistent with the RFCs. The ALJ relied on the vocational expert's testimony to determine that Bodine was able to perform her past relevant work as a secretary prior to February 22, 2011, but that she was unable to perform any past relevant work beginning February 22, 2011. Consequently, he determined that she was disabled effective February 22, 2011, but that she was not under a disability at any time through her last insured date of June 30, 2007.

## Discussion

Here, Bodine argues that the ALJ substantially erred when he found her disability onset date to be February 22, 2011, and failed to call a medical advisor to assist him in determining her onset date. I agree and will remand this case for further review for the reasons set out below.

Social Security Ruling 83–20 governs the determination of disability onset dates and is binding on the Commissioner, including the decisions of an ALJ. See Heckler v. Edwards, 465 U.S. 870, 873 n. 3 (1984) (noting that, although Social Security Rulings do not have the force of law, they are binding on "all components of the Social Security Administration."); Grebenick v. Chater, 121 F.3d 1193, 1200–01 (8th Cir. 1997); 20 C.F.R. § 402.35(b)(1). An ALJ, therefore, must follow SSR 83–20's procedures to determine the onset date of a claimant's

disability. Social Security Ruling 83–20 distinguishes between disabilities of
traumatic origin and those of non-traumatic origin. For disabilities of a non-
traumatic origin, "the determination of onset involves consideration of the
applicant's allegations, work history, if any, and the medical and other evidence
concerning impairment severity. The weight to be given any of the relevant
evidence depends on the individual case." SSR 83–20, 1983 WL 31249, at *2
(Soc. Sec. Admin. 1983). The Regulation recognizes that, "[w]ith slowly
progressive impairments, it is sometimes impossible to obtain medical evidence
establishing the precise date an impairment became disabling," as often "the
alleged onset and the date last worked are far in the past and adequate medical
records are not available." Id. "In such cases it will be necessary to infer the onset
date from the medical and other evidence that describe the history and
symptomology of the disease process . . . ." Id.

> [T]he date alleged by the individual should be used it if is consistent
> with all the evidence available. When the medical or work evidence is
> not consistent with the allegation, additional development may be
> needed to reconcile the discrepancy. However, the established onset
> date must be fixed based on the facts and can never be inconsistent
> with the medical evidence of record . . . . How long the disease may
> be determined to have existed at a disabling level of severity depends
> on an informed judgment of the facts in the particular case. This
> judgment, however, must have a legitimate medical basis. At the
> hearing, the ALJ should call on the services of a medical advisor
> when onset must be inferred.

Id. at *2-*3. "Convincing rationale must be given for the [onset] date selected."

Id.  If the medical evidence is ambiguous regarding the possibility that the onset date of disability occurred before the expiration of a claimant's insured status, then SSR 83-20 requires the ALJ to call upon the services of a medical advisor to determine the claimant's onset date.  Grebenick, 121 F.3d at 1201.

Here, Bodine alleges that the February 22, 2011, onset date selected by the ALJ is not supported by convincing rationale.  According to Bodine, the medical records and her testimony establish that she was unable to perform her past relevant work as a secretary before her last insured date of June 30, 2007.  The ALJ does not explain why he chose that particular onset date, but it correlates with an examination by Dr. Asher, during which he noted that Bodine's Parkinson's disease symptoms had gotten worse.  (Tr. 386-87).  Although the ALJ acknowledged that Parkinson's disease is a slow developing progressive impairment, he concluded that no medical advisor was needed to establish Bodine's onset date "because the claimant's onset can be reasonably inferred from reviewing the claimant's allegations, her work history, and the medical evidence of record."  In support of his decision regarding the onset date, the ALJ stated that Dr. Asher never indicated that Bodine was disabled before February 22, 2011.  The ALJ also believed that Bodine's medications were generally effective in controlling her symptoms before that date, and that she did not "receive before the established onset date the type of medical treatment one would expect for a

disabled individual" because she only saw her treating neurologist on a roughly annual basis until 2010.  As for Bodine's testimony regarding why she stopped working in October of 2006, the ALJ believed that Bodine's inability to perform heavy farm labor was unrelated to her ability to perform her past relevant work as a secretary.  Finally, the ALJ considered the medical source statement completed by Dr. Asher on May 31, 2012, and concluded as follows:

> Dr. Asher did not mark a checkbox on the MSS, which asked him whether he thought the claimant's disability began on October 1, 2006.  He also gave no supplemental reason for stating when he thought the claimant's disability began.  Since Dr. Asher was free to check the box and did not, he apparently intended to represent that the claimant has not been disabled since October 1, 2006.  This conclusion is additionally supported by the fact that directly beneath the other check box, Dr. Asher did check that the claimant's limitations have lasted or will last for 12 consecutive months.  This supports the conclusion that Dr. Asher's MSS is only reflective of the claimant's functioning since May 31, 2011, which is after the established onset of disability.[2]

In deciding that the expertise of a medical advisor was unnecessary to establish the onset date of disability, the ALJ substantially erred.

Here, there is no dispute that Bodine is disabled from Parkinson's disease or that Parkinson's disease is a "slowly progressive impairment" as used in SSR 83-20.  There is also no dispute that Bodine's diagnosis was remote in time -- 2005, which was seven years before the hearing date -- with symptoms appearing a year

---

[2] The reference to May 31, 2011, is in error, as the ALJ correctly acknowledged in the same paragraph that the MSS was completed on May 31, 2012.

before.  Moreover, the medical records from her initial diagnosis do not appear in the file.  At this time, the record is ambiguous as to the exact date on which Bodine's condition became disabling.  While the ALJ determined the date was in February of 2011, the record also contains substantial evidence that Bodine's Parkinson's disease could have been disabling well before her last insured date of June 30, 2007.  By the time Bodine stopped working in October of 2006, she had already experienced symptoms of Parkinson's  -- including a shaking of the left hand at rest and with use -- for two years, with continued symptoms despite trying several Parkinson's medications.  She could no longer play the piano or hold a piece of paper, and she had difficulty typing.  Bodine's shaking hands also affected her writing, and she had problems with dropping and holding things.  During her first visit with treating neurologist Dr. Asher in June of 2005, Bodine reported numerous side effects from various Parkinson's medications, including "loopiness," significant weight loss, vomiting, headaches, dry mouth, and "chalky teeth."  She displayed mild rigidity, a mild-to-moderate left arm resting tremor, increased with contralateral activity, and diminished arm swing on the left while walking.  While it is true that Bodine and Dr. Asher reported that she "was doing well" after he placed her on Sinemet during her visits in August of 2005 and March of 2006, these records are fairly brief and contain no objective test results.  What they do confirm, however, is that Bodine was on a heavy medication regimen

which included 25/100 mg of Sinemet at 8 a.m., 12 p.m., and 5 p.m. and Mirapex 1

mg at 6 a.m., 2 p.m., and 10 p.m.  The ALJ did not address the scope or

significance of Bodine's medication regimen as it relates to onset date, except to

simply state that the medications were "relatively effective in controlling the

claimant's symptoms."   By April 3, 2007, Bodine was apparently reporting some

wearing off her medications, although it was not described as "significant," and

she was only sleeping "okay."

Given the paucity of information available in the record about the exact

nature of Bodine's Parkinson's disease prior to her last insured date, Dr. Asher's

opinion regarding onset date would have been seemingly essential to the ALJ's

determination on this issue.  However, Dr. Asher did not provide an onset date in

his MSS, either by agreeing or disagreeing with Bodine's claimed date of October

1, 2006, or by providing his own date.  The ALJ concluded -- without contacting

Dr. Asher for clarification -- that this was not an oversight and that Dr. Asher

believed Bodine had not been disabled since October 1, 2006.  Because the ALJ

retains the responsibility of developing a full and fair record in the non-adversarial

administrative proceeding, the ALJ erred in failing to develop the record so as to

determine exactly what this omission meant to Dr. Asher.  See  Hildebrand, 302

F.3d 836, 838 (8th Cir. 2002).  Contacting Dr. Asher would have also enabled the

ALJ to determine what "doing well" actually meant, as someone with Parkinson's

disease could be considered to be "doing well" but still unable to work.  See id. (ALJ substantially erred in part by failing to contact author of medical reports to determine what subjective phrases meant).  This is especially true given Bodine's description of her activities and limitations during this time period.  The ALJ then compounded his error by using his unsupported assumption about Dr. Asher's opinion to improperly bolster his conclusion that the opinion of a medical advisor was not required.  In doing so, the ALJ substantially erred.  Because the medical evidence is ambiguous, the ALJ erred by failing to call upon a medical advisor to determine the onset date.  See Beers v. Astrue, 2011 WL 1226948, *11 (E.D. Mo. Mar. 30. 2011); Long v. Astrue, 2009 WL 705879, *9 (E.D. Mo. Mar. 16, 2009); Westbrook v. Astrue, 2007 WL 5110314, *10 (Aug. 20, 2007).  The ALJ also failed to fully and fairly develop the record.  See Snead v. Barnhart, 360 F.3d 834, 839 (8th Cir. 2004).  These errors require remand for further proceedings.

## Conclusion

Because substantial evidence in the record as a whole does not support the ALJ's decision, this matter is remanded to the Commissioner to redetermine the onset date of Bodine's Parkinson's disease with the assistance of a medical advisor and to provide specific findings and convincing rationale to support this determination in accordance with SSR 83-20.  The ALJ shall also contact Dr. Asher for clarification of his opinion regarding Bodine's onset date and the nature

and extent of her disabling condition for a fair and full development of the record. The ALJ should also order any testing or consultative examinations required to fully and fairly develop the record, and if necessary, reassess a residual functional capacity consistent with the medical and other evidence. Therefore, I reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate Judgment in accord with this Memorandum and Order is entered this same date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 23rd day of April, 2015.